# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**SANDRA CHEVOLA,**

      **Plaintiff,**

**v.**                                    **Case No.  8:06-cv-1312-T-30MAP**

**CELLCO PARTNERSHIP, d/b/a
VERIZON WIRELESS,**

      **Defendant.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment (Dkt. 34), Plaintiff's Memorandum in opposition to the same (Dkt. 55), and the Joint Motion to Suspend the Dates of the Final Pretrial Conference and Trial (Dkt. 60).  The Court, having considered the motions, memoranda, and supporting documentation, and being otherwise fully advised in the premises, determines that Defendant's Motion for Summary Judgment should be granted in part and denied in part, and that the Joint Motion should be denied as moot.

### Background

On or about May 17, 1997, Plaintiff Sandra Chevola ("Chevola" or "Plaintiff") was hired as a Business Account Executive ("BAE") for PrimeCo Personal Communications, a predecessor to Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless" or

"Defendant").[1]  Chevola was 42 years old at the time she was hired.[2]  Her position was part of the Business to Business ("B2B") Channel in the Florida-West region of Verizon Wireless.  As a part of the B2B Channel, Chevola sold Verizon Wireless products and services directly to business customers and their employees.

When Chevola was hired, the BAE position was the only sales position in the B2B Channel.  During the course of her employment, Defendant added the positions of Major Account Manager ("MAM") and National Account Manager ("NAM").  BAE's targeted businesses with less than 300 employees, MAM's targeted those with more than 300 and less than 1,000 employees, and NAM's targeted businesses with more than 1,000 employees and offices outside of Florida.

As a BAE, Chevola was supervised by Jamie Young, who managed a team of sales executives.  On or about October 1, 2002, Defendant promoted Chevola (then 47) to fill a new MAM position.  B2B Director Colleen Chappel, to whom Young reported, selected Chevola for the position.  This decision was supported by Young, who continued to supervise Chevola in her new role.  Shortly thereafter, Andrea Orr replaced Young as B2B Director.  As B2B Director, Orr reported to Mike Lanman, then Regional President of Florida, who reported to Jack Plating, then South Area President.

---

[1]Verizon Wireless was formed in 2000.  Plaintiff was employed by Verizon Wireless from its inception through the termination of her employment in December of 2004.

[2]Chevola was born on April 8, 1955.

Both the BAE and MAM positions involved telemarketing, cold calling, networking, direct mailings, and calling on prospects.  As a result, Chevola spent very little time in the office.  As a MAM, Chevola was also responsible for negotiating pricing and contracts with customers and maintaining a high level of customer service.  While MAM's coordinated the handling of customer service issues with a Business Sales Representative ("BSR") and a Business Support Association ("BSA"), the MAM was ultimately responsible for an account client's satisfaction.

Throughout the course of her employment, Plaintiff was a leading and top sales producer for Defendant.  She earned numerous sales awards and consistently received high marks on her annual reviews.  Plaintiff received such awards as late as July of 2004 at an All-Hands Meeting.[3]  Her colleague, Ford Frey compared Chevola at this event to "Dustin Hoffman at the Oscars, she was just taking down one after the other." (Frey Dep. at 53). Frey went on to state he did not recall anyone else winning an award, and that Chevola "took down most, if not all the trophies."  Id. at 55.  Frey stated such awards likely included such categories as "top MAM last month, top MAM for the quarter, most activations, highest revenue growth," and "key performance indicators."

While Plaintiff received numerous sales awards during her tenure at Verizon, she was also subject to both formal and informal disciplinary action.  On or about May 3, 2003, Young issued Chevola a Letter of Concern ("LOC") for falling below her sales performance

---

[3]In her deposition, Orr stated awards given at this meeting were based on first and second quarter performance for 2004.  She stated she could not recall whether the awards Chevola received at the meeting were for the first quarter, the second quarter, or both.

quota for the preceding month.  Chevola complained to Jim Handley, Associate Director of Human Resources for the West Florida Region, that she fell below her quota because Young had unfairly given credit for eighteen of her activations to Gary Baldus, another BAE. During his deposition, Handley testified that he advised Young and Orr to retract the LOC based on Chevola's history of good performance.  He stated that he did not feel an LOC was necessary based on her having one bad month.

On or about January 16, 2004, Chevola was reprimanded by Young for quoting a price to a customer that was to change a week later.  As a result, Orr required Chevola to obtain her approval before quoting future prices.  On or about January 19, 2004, Chevola complained to Defendant's Compliance Guideline that she had been improperly blamed for misquoting the prices.  The Compliance Guideline was a toll-free number operated by a third-party vendor.  Employees could contact the Guideline to raise complaints regarding issues in the workplace.  Any Complaints were sent to the Verizon Wireless Compliance Office, where they were investigated internally.  Handley investigated Chevola's complaint and concluded that she had been treated fairly.

On or about February 16, 2004, Young issued Chevola a LOC for failure to return push-to-talk demo phones in a timely manner.  Plaintiff protested the LOC but admitted to not returning the phones in a timely manner.  She claims Lanman and Handley told her not to worry about the LOC because it was not official and would not become a part of her personnel file unless it was escalated.  This LOC was not escalated.  However, Plaintiff

claims she was singled out and that other employees in her area were not audited or issued letters of concern regarding the demo phones.

In early 2004, Lanman and Orr decided to realign the B2B Channel by creating a separate strategic accounts team, to be headed in each area of the state by an Associate Director. On or about February 23, 2004, Defendant hired Christal O'Donoghue as the Associate Director of Strategic Sales-West. Chevola was transferred from Young's team to the new team supervised by O'Donoghue.

During the time Chevola was supervised by O'Donogue, disciplinary actions taken against her became more serious in nature. On or about May 21, 2004, O'Donoghue issued Chevola a Letter of Concern and placed her on a performance improvement plan ("PIP") as a result of customer complaints regarding the Raymond James and the St. Petersburg Police Department ("SPPD") accounts. The PIP required Plaintiff to report on the subject accounts on a weekly basis for eight weeks. While Plaintiff's reports were not timely, the LOC was not escalated due to progress on the subject accounts.

On or about August 23, 2004, Plaintiff again contacted the Compliance Guideline complaining that O'Donoghue had continually harassed her in an attempt to force her to resign. Chevola complained of unjust reprimands, false statements, and that she was being set up for termination because she was the only employee left from the former staff. She also complained that O'Donoghue wanted the more lucrative accounts for herself.[4] At Plaintiff's

---

[4]In her deposition, Chevola described O'Donoghue as being aggressive and out to get every account she could get her hands on. She also testified that O'Donogue specifically wanted to take
(continued...)

request, John Lucas, then Manager-Employee Relations, conducted an investigation of Chevola's complaint.   As a part of his investigation, Lucas interviewed Chevola and approximately twenty other employees.

On or about September 23, 2004, O'Donoghue reported another customer complaint to Orr raised by Tim Jay of the SPPD.  In August of 2004, Chevola received a call from a detective with the SPPD requesting activation of a line of service needed as a part of an undercover investigation.  When Chevola could not contact the authorized user for the SPPD account, she made a judgment call under the circumstances to activate the line.  Chevola later documented the activation.  Jay believed Chevola had forged his signature on this activation.  Jay also complained that the SPPD was improperly billed for the service.  The line, however, remained active as it was necessary to the SPPD investigation.

Lucas was assigned to investigate the alleged forgery at the same time he was investigating Chevola's Compliance Guideline complaint.  During his investigation, Chevola complained about O'Donogue's discriminatory treatment of her and favoritism towards employees Russ Cuccia, Gary Mariano, and Colette Harper.[5]  Upon learning of the SPPD complaint, both Lanman and Orr expressed a desire to terminate Chevola.  Lucas advised

---

[4](...continued)
accounts from Young.

[5]Colette Harper, a female employee, is approximately the same age as Chevola.  As of November 1, 2007, Chevola was 52, Cuccia was 53, Mariano was 50, and Harper was 51 (according to Defendant's records).

them against taking such action and recommended they instead place her on a Final Written

Warning ("FWW").  During his deposition, Lucas testified that he recommended this action

> [f]or a couple of reasons.   One, Ms. Chevola was a tenured employee.   I
> believe that she had the best interest of the customer at heart.   She had raised
> a lot of concerns that had not yet been resolved.   And I didn't want any
> feelings of retaliation drawn into the termination of employment.

(Lucas Dep. at 273-274).  Plaintiff argues Lucas advised against firing Chevola at this point

in time to intentionally build a file against a retaliatory filing.  Plaintiff cites to a November

1, 2004 email in which Lucas stated that

> Mike Lanman wanted Ms. Chevola out of the business after the
> aforementioned complaint from the St. Petersburg Police Department. Ms. Orr
> was very receptive to my counsel.  I did not think we could face the "red
> faced" test so I pushed back.

On or about October 12, 2004, Orr and Lanman, in accordance with advice from

Lucas and Handley, decided to place Plaintiff on a Final Written Warning ("FWW") and

transition Chevola back to a BAE position.  Defendant claims this decision was based on the

alleged forgery and customer complaints from seven major accounts.  On or about October

18, 2004, Lucas scheduled a meeting with Chevola and Orr for October 25, 2004.  The

purpose of the meeting was to close the investigation and issue the FWW.

On or about October 23, 2004, two days before the scheduled meeting, Chevola

emailed Lucas indicating she had information regarding several instances of reported fraud

on B2B accounts.  Chevola would not provide this information via email and requested a

separate meeting with Lucas prior to the scheduled meeting. Chevola testified she probably

discussed the additional fraud issues with Lucas the following Monday.

On or about October 25, 2004, Lucas and Orr met with Chevola.  Lucas indicated he could not corroborate her grievances, and Orr administered the FWW.  Orr advised Chevola that she would be moved to a BAE position under Young with no change to her base salary.  Chevola was given the option to accept the BAE position or resign.  Later that day, Chevola complained to Martha Delahanty, the Vice President of HR, that she had been demoted in retaliation for reporting hostility and fraud.  Upon advice from Lucas, Chevola was placed on a two-week leave of absence to provide Defendant the opportunity to investigate her claims and Chevola the opportunity to consider the decision.  During their conversation regarding the leave of absence, Chevola raised concerns to Lucas about her health.  Lucas informed Chevola that she could make a short term disability ("STD") claim with Met-Life, the third party administrator of Defendant's STD benefits plan.

Michael Golabek, Executive Director of HR and Lucas' supervisor, investigated Plaintiff's claims and communicated with her regarding her options.  Chevola ultimately purported to accept the BAE position "under protest."  Golabek explained that this was not an option, and that she must accept the new position without conditions.  On or about November 15, 2004, Chevola reported to work to start the BAE position following her leave of absence.

On or about November 23, 2004, Chevola emailed Lanman requesting a meeting to discuss what had really happened to her.  Lanman responded saying that he was not interested in meeting, but encouraged Chevola to put the past behind her and make the most

of the new BAE opportunity.  Chevola responded saying she usually respected his decisions, but that in this instance he was "dead wrong."

In a letter from MetLife Disability dated November 24, 2004, Plaintiff was informed her short term disability benefits had been denied.  In a separate letter dated the same day (November 24, 2004), MetLife informed Plaintiff that she had been approved for a leave of absence under the Family and Medical Leave Act of 1993 ("FMLA"), which was effective October 29, 2004 through November 30, 2004.  Plaintiff claims to have been unaware she was entitled to the FMLA, and that she did not receive the letter until after the approved period had expired.  As of  November 30, 2004, Defendant was aware Chevola's STD benefits had been denied and that she had been approved for the FMLA leave.  Defendant never discussed the FMLA leave with Plaintiff, and at no time did she request to take it.[6]

Orr scheduled a meeting with Chevola for December 3, 2004, at 4:00 p.m. to review her performance and transition to the new BAE roll.  The meeting was, in part, scheduled to address Chevola's failure to communicate with Young regarding the status of an illness that was keeping her from work, and her continued failure to appropriately report her time on Defendant's time management system.  Plaintiff indicated she may not be able to attend the meeting because she was under a doctor's care, was suffering from dizzy spells, and could not drive long distances.

---

[6]On September 7, 2007, the Court denied Plaintiff's motion to amend its Amended Complaint to add a claim for an alleged violation of the FMLA.  The Court will not reconsider such a claim in this Order.

On Friday, December 3, 2004, the day of the scheduled meeting, Plaintiff attended a customer's employee day.  At approximately 3:00 p.m., she called Young from the event and informed him she could not attend the meeting because she was not feeling well.  Young rescheduled the meeting for 9:00 a.m. on Monday, December 6, 2004.  Young instructed her to call him at 9:00 a.m. sharp if she was not feeling well that morning.

On the morning of December 6, 2004, at approximately 9:00 a.m., Chevola called Young to indicate she could not attend the meeting as she did not feel well.  When Young did not answer, Chevola claims she left messages with Young, Young's assistant, Orr, and Orr's assistant regarding her inability to attend.  At approximately 3:00 p.m., Orr called Plaintiff and read her a termination letter.  The reasons stated for her termination were her: (i) failure to respond to her manager's attempts to reach her regarding her work status[7]; (ii) failure to report time in an appropriate manner; (iii) failure to return company equipment; (iv) declining the meeting for an alleged illness when she was really attending a customer's employee day; (v) failing to attend the second scheduled meeting; (vi) failure to return her MAM handset despite her commitment to do so by November 19, 2004; (vii) forwarding her

---

[7]Young testified that Chevola was out with the flu during the week of November 22, 2004. He sent her an email to see if she was requesting days off as vacation days, and if she wanted him to keep sending leads while she was out.  Receiving no response, he sent a follow up email on November 24, 2004, stating that he definitely needed to hear from her by November 29, 2004, and that she needed to submit her time on Defendant's online reporting system.  On December 2, 2004, Young sent an email to HR indicating that he had received no reply to his requests regarding her illness, work status, or time reporting.

MAM voicemail to her BAE handset after her pass code had been cancelled[8]; and (viii) failing to move forward with the BAE position in a positive, cooperative and professional manner.  Defendant hired John Christison, who was then 45 or 46 years old, to fill Chevola's position.[9]

Following the termination of her employment, Plaintiff sent several anonymous emails to various Verizon Wireless executives purporting to anonymously complain about members of her former team and management.  Plaintiff made some of the e-mails falsely appear to come from the personal e-mail accounts of her former colleagues who were still employed by Defendant.  Defendant filed a lawsuit in state court against "[o]ne or more unknown John Does" and obtained a temporary injunction against the anonymous sender.  Defendant subpoenaed records that identified Chevola as the anonymous sender.  Ultimately, the parties agreed to entry of permanent injunction against Chevola and her husband.

On or about August 28, 2006, Plaintiff filed her Amended Complaint.  Plaintiff has asserted sixteen claims for relief based on her demotion, termination, and a number of additional alleged adverse employment actions.  Plaintiff claims such actions were taken against her because of her age, gender, purported disability, and her objections to Defendant's unlawful and discriminatory business practices.  Plaintiff also alleges she was

---

[8]Defendant claims this action precluded it from servicing MAM accounts as O'Donogue's team could not access customer's calls.

[9]According to Defendant's records, Christison was 48 as of November 1, 2007.  He was hired in 2005.  However, his exact age at the time he was hired is unclear, as neither his birth date nor his hire date have been provided to the Court.

paid less than male employees, and that Defendant breached its employment agreement with her.

A number of Plaintiff's claims relate to actions of O'Donoghue that were allegedly acquiesced in or consented to by Orr, Lanman, and/or other members of Verizon Wireless management. Plaintiff claims O'Donoghue took a hostile attitude against her and openly and routinely belittled, undercut, and intimidated her. According to Plaintiff, O'Donoghue and the other members of her team mocked and shunned her because of her age, excluded her from office communications, denied her access to company resources, discredited her accomplishments, met with her customers to elicit complaints about her, denied her sales leads, and essentially exiled her from interoffice matters. Plaintiff asserts that the purpose of this behavior was to force Plaintiff to resign so Defendant could turn over her position to a younger male employee.

Plaintiff claims that O'Donoghue set her up to fail by forcing her to cover additional territories and take time to train new hires in addition to her regular job duties. In addition to the extra work load, Plaintiff claims she was not compensated for these efforts and that she was denied the company resources, including staff assistance, necessary to successfully complete them. Due to the additional duties and lack of support, Plaintiff claims some customer complaints were inevitable. Nevertheless, Plaintiff argues that the complaints resulting in her being put on the PIP were contrived.

The record in this action is voluminous. Plaintiff has raised numerous complaints relating to the conduct of Defendant and its employees over the course of her employment.

A number of her grievances may very well be supported by evidence of unfair treatment and favoritism toward specific individuals. However, the Court need not discuss each of these grievances or the evidence supporting them. Rather, the Court will consider only the facts and law pertinent to each of her asserted claims for relief.

## Discussion

### I.    Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. Id. Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in his or her favor. Id. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that

there is a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 324.   The evidence must be significantly probative to support the claims.  <u>Anderson</u>,  477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. <u>Fernandez v. Bankers Nat'l Life Ins. Co.</u>, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." <u>Warrior Tombigbee Transp. Co. v. M/V Nan Fung</u>, 695 F.2d 1294, 1296 (11th Cir.1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S. at 248; <u>Hoffman v. Allied Corp.</u>, 912 F.2d 1379 (11th Cir. 1990).   However, there must exist a conflict in substantial evidence to pose a jury question.  <u>Verbraeken v. Westinghouse Elec. Corp.</u>, 881 F.2d 1041, 1045 (11th Cir. 1989).

## II.     Legal Analysis

### A.      Age Discrimination Claims (Counts I, IX)

Plaintiff has asserted claims for age discrimination pursuant to 29 U.S.C. § 623(a)(1), and Section 760.10(1)(a), Florida Statutes.  Plaintiff claims that the actions and comments of her managers are evidence of such discrimination.  Plaintiff claims to have heard Young make the following comments: (i) that he had hired another older woman like Plaintiff and he thought she would be happy to have someone with whom she could do things, (ii) that she dressed like his mother because they both shopped at Talbot's, and (iii) that he would not consider hiring a potential recruit because he was "old and wrinkled."  Plaintiff also claims to have heard Lanman comment that the company was getting "younger and fresher blood"

when O'Donoghue was hired.  According to Plaintiff, the numerous hostile acts taken against her by O'Donoghue were motivated by her age.  The Court notes that comments by Young are not circumstantial evidence of discriminatory animus on the part of O'Donoghue.  And the only comment by Young that might qualify as circumstantial evidence is the "old and wrinkled" comment.

The Age Discrimination Act of 1967 (the "ADEA") makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Under the ADEA, a plaintiff claiming disparate treatment bears the ultimate burden of proving age was a determining factor in the employer's decision to fire him or her.  Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).  The plaintiff's age must have "actually played a role [in the employer's decisionmaking] process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141 (2000) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)).

The Eleventh Circuit has applied the analytical framework developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973), to assess claims brought under the ADEA based on circumstantial evidence.  Carter, 870 F.2d at 582.  Under this framework, Plaintiff must first establish a prima facie case by showing that (1) at the time she was fired, she was a member of the protected group between the ages of forty and seventy, (2) she was subject to adverse employment action, (3) a substantially younger person filled the position from

which she was discharged, and (4) she was qualified to do the job for which she was discharged.  Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1359 (11th Cir. 1999).

It is undisputed that Plaintiff was a member of a protected class as she was over the age of 40 for the duration of her employment.  To show she was subject to adverse employment action, Plaintiff must demonstrate that Defendant's actions impacted the "terms, conditions, or privileges of her job" in a "real and demonstrable way."  Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1237 (11th Cir. 2001).  In Count I, Plaintiff alleges Defendant discriminated against her by demoting her, terminating her, and otherwise discriminating against her with respect to her compensation, terms, conditions and privileges of her employment.  It is undisputed that her termination was an adverse employment action. Further, while the transition to the BAE role did not change the Plaintiff's base salary, it was clearly a change in title and prestige since she was reassigned to smaller accounts.  Thus, a reasonable juror could conclude Plaintiff's demotion to the BAE position and her termination were both adverse employment actions.[10]

---

[10]When asked to describe any adverse employment actions in Defendant's first and second sets of interrogatories, Plaintiff responded with over 70 pages and over 160 claims.  These claims range from alleged improper employment decisions to numerous allegations of unfair treatment, hostility, and favoritism exhibited by Plaintiff's management and co-workers.  It appears that a number of these claims are barred by the relevant statutes of limitations.  As Plaintiff only addresses the demotion and termination in opposing the instant motion, and as Plaintiff has otherwise established a prima facie case of age discrimination, the Court need not address these claims individually.

Chevola was 49 at the time her employment was terminated.   She was replaced by John Christison, who was 45 or 46 at the time he was hired for her position.   Whether Christison was "substantially younger" than Chevola is a question better left to a jury. Further, based on her history of success at Verizon Wireless, a reasonable juror could conclude she was qualified for both the BAE and MAM positions.   Accordingly, Plaintiff has established a prima facie case of age discrimination.

The establishment of a prima facie case by Plaintiff shifts the burden to Defendant to respond with a legitimate, nondiscriminatory reason for the adverse employment action. Reeves, 530 U.S. at 142.  Defendant has provided testimony supporting each of the stated nondiscriminatory reasons for Plaintiff's demotion and termination.  The Court concludes that it has met its burden.

As Defendant has established nondiscriminatory reasons for the adverse actions, the burden  returns to Plaintiff to establish that the proffered reasons were a pretext for discrimination.  Id. at 143.  Plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Carter, 870 F.2d 584.  Plaintiff denies each of the proffered reasons for her demotion and termination.  She claims that her failure to attend both meetings resulted from illness.  Though she admits to attending the employee day on December 3, 2004, she claims that she was ill and laid down before leaving. Due to her condition, she claims she could not make the drive back to the office, thus resulting in her request to reschedule.

Plaintiff also claims that, despite Young's assertions, she was in constant contact with his assistant while she was off work.   She testified that Young gave her permission to keep the MAM handset beyond November 19, 2004, in order to transfer numbers.  She also claims she offered to return it via overnight delivery.  Plaintiff also points out that, despite the fact that prior annual reviews referenced her inability to turn in paperwork and return equipment in a timely manner, she still was consistently awarded the highest assessment possible.  It is undisputed that Chevola received no customer complaints following her transfer to the BAE position.

As to the customer complaints leading to her demotion, Plaintiff argues that many customers,  particularly government accounts, experience billing problems resulting in complaints.  Young testified that a number of salespersons were frustrated over these issues. Plaintiff also points out that the record is devoid of deposition testimony or affidavits from complaining customers.  While Plaintiff's supervisors have testified to receiving complaints from customers, the only record evidence authored by a customer is an email from Tim Jay regarding billing issues and the alleged forgery on the SPPD account.  Plaintiff denies his allegations of forgery.

Defendant argues that Plaintiff's assertion that customer billing problems were supposed to be resolved by other employees does not relate to customer complaints regarding customer service, and that she was ultimately responsible for customer satisfaction. Although Plaintiff denies forging the SPPD activation, Defendant argues she nevertheless admitted to activating the account without the proper authorization.

As to Plaintiff's conduct in the new BAE role, Defendant argues that even if Plaintiff kept in contact with Young's assistant regarding the status of her illness, she still failed to keep in contact with Young.  Defendant argues Chevola has failed to provide a reasonable explanation as to why she could attend the function on December 3, 2004, but not make it to the scheduled meeting.  Further, Defendant argues that even if Plaintiff had permission to keep the MAM handset, she still impeded Defendant's access to its customers by forwarding calls to her BAE handset.

The Court agrees that Plaintiff's excuse for missing the scheduled meetings is a weak one.  However, taking into consideration (i) Plaintiff's record of high performance with the company, including her receipt of numerous awards as late as July of 2004, (ii) Young's comment that he would not hire a man who was "old and wrinkled"[11], (iii) the lack of deposition or sworn testimony from the customers who lodged the alleged complaints, (iv) the special circumstances surrounding Plaintiff's activation of the SPPD account without authorization, (v) a disputed issue of fact as to whether Chevola forged Jay's signature, and (vi) the short period of time between Plaintiff's demotion and termination, the Court concludes that the question of whether Plaintiff has established pretext is better left for a jury.

---

[11]Defendant argues that Young's comments should not be considered as only Orr and Lanman participated in the decision to terminate her.  However, Young was Plaintiff's supervisor at the time of her termination, and his complaints regarding her conduct were stated as reasons for her termination.

Thus, Defendant's Motion for Summary Judgment is **DENIED** as to **Counts I and IX** of Plaintiff's Amended Complaint.[12]

## B.   Gender Discrimination Claims (Counts III, XI)

In Count III of the Amended Complaint, Plaintiff has asserted a claim for gender discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and has alleged a similar claim under Florida law (Count IX).  Plaintiff claims Defendant discriminated against her because of her sex as a result of her demotion, termination, compensation, and by the terms, conditions and/or privileges of her employment.

The burden shifting McDonnell Douglas framework also applies to Plaintiff's claim for gender discrimination.  To establish a prima facie case for gender discrimination, Plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably, and (4) she was qualified to do the job.  Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

The only element of Plaintiff's prima facie case at issue is whether Defendant treated similarly situated male employees more favorably.  "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider

_____

[12]As recognized by Florida courts, the Florida Civil Rights Act of 1992 (the "FCRA") was patterned after  Title VII and the ADEA.  Brown Distributing Co. Of West Palm Beach v. Marcell, 890 So.2d 1227, 1230 (Fla. 4th DCA 2005).  Federal case law interpreting Title VII and the ADEA is applicable to actions arising under the FCRA.  Id.  Thus, Defendant's Motion for Summary Judgment as to Plaintiff's age discrimination claim asserted under the FCRA is also denied.

whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." <u>Id.</u> (additional citations omitted).  In the disciplinary context, the most important factors are "the nature of the offense**s** committed and the nature of the punishments imposed." <u>Id.</u> (internal quotations and citations omitted).  The Eleventh Circuit requires the  "quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions, and confusing apples with oranges."  <u>Id.</u>

While Plaintiff has argued that Young showed favoritism to male employees, and has provided evidence of such favoritism, she has failed to identify any male comparators that were accused of the same or similar conduct, but were disciplined in a different way.[13]  As Plaintiff has failed to meet her burden of pointing to a male employee who engaged in the same or similar conduct, she has failed to establish a prima facie case of gender discrimination.

Accordingly, summary judgment is **GRANTED** in favor of Defendant as to **Counts III and XI** of Plaintiff's Amended Complaint.

### C.    Equal Pay Act Claim (Count V)

In Count V of the Amended Complaint, Plaintiff asserts a claim for violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) ("EPA").  In the Amended Complaint, she

---

[13]In Plaintiff's Memorandum opposing the instant motion, the section addressing gender discrimination fails to identify any comparators. (See Plaintiff's Memorandum, Dkt. 55, pp. 26-27). Similarly, the Amended Complaint, while it alleges males and females were treated differently, does not identify any comparators.

provides the following examples of EPA violations: (i) Ford Frey, a peer of Plaintiff, was hired at a base salary of $79,000.00, while Plaintiff's base salary was $58,000.00, (ii) three males were given the house account, Verizon Communications, despite Plaintiff's requests to participate on the account, her historical service of the account, and the fact that a large portion of the account was in her designated territory, (iii) Defendant discounted Plaintiff's commissions on government accounts, but did not discount male salespersons' commissions, (iv) John Christison, a male employee, was given 50% quota relief for two months while Plaintiff was not, and Christison was otherwise paid for Plaintiff's efforts, (v) Plaintiff was not paid for 200 activations on accounts she created[14], and (vi) Plaintiff was denied "six-month" ramp up quota relief that was provided to male employee John Cristison.

A plaintiff establishes a prima facie case for EPA violations by showing the employer "pays different wages to employees of opposite sexes 'for equal work on jobs . . . [requiring] equal skill, effort, and responsibility, and which are performed under similar working conditions.'" Irby v. Bittick, 44 F.3d 949, 954 (11th Cir. 1995) (quoting Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974).  Once a prima facie case is established, the employer must prove by a preponderance of the evidence that the differential is justified by one of the following four exceptions: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by the quantity or quality of production; or (iv) a differential based on any other factor other than sex."  Id.  "Any other factor other than sex" may include

---

[14]The Amended Complaint does not allege these activations were given to male employees.

unique characteristics of the same job, an individual's experience, training, or ability, or special exigent circumstances connected with the business.  Id. at 955.

The employer's burden is a heavy one, because it must show that the factor of sex provided no basis for the wage differential.  Id. at 954.  If the defendant fails to meet this burden, the court must enter judgment for the plaintiff.  Id.  If defendant overcomes the burden, the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential.  Id.

Defendant admits that Kevin Ewing and Ford Frey, both MAMs, performed jobs that required equal skill and effort, and responsibility, and were performed under similar conditions.  However, Defendant argues that prior to being hired, Frey had over 17 years experience in the sales industry and extensive experience in the financial aspects of the telecommunications business.    Ewing  had  five  years  experience  as  a  wireless telecommunications account manager and expertise in wireless data, which at the time was allegedly difficult to find.  Furthermore, both Ewing and Frey made higher salary demands (based on their previous salaries) than the initial salary offered by Defendant.  Defendant also argues that two male MAM employees were hired at lower salaries than Plaintiff.[15]

In response to the instant motion, Plaintiff argued that Frey's past experience was not the same type of selling as experienced by Plaintiff and required by the MAM position. Plaintiff cites to testimony from Frey's deposition in which he states he left   Verizon

---

[15]The Court notes that both of these employees were hired as MAMs after Plaintiff was terminated.

Wireless, in part, because it was not the type of sales he had engaged in previously.  Plaintiff also argued that in her answers to the Defendant's interrogatories, she stated that her commissions on government accounts were subject to a 25% discount as compared to male employees.  Plaintiff did not address Defendant's argument regarding Ewing's qualifications, and neither party addressed the additional examples of unequal pay raised in Plaintiff's Amended Complaint.

Defendant has argued that the only evidence Plaintiff has presented regarding the 25% discount is a statement in her interrogatory that Michael Hawthorne, a NAM and Global Account Manager ("GAM"), advised her that his commissions were not reduced by 25%.  Defendant argues that the statement is inadmissible hearsay, and that Hawthorne's NAM and GAM positions did not require equal skill, effort, and responsibility, and were not performed under similar working conditions.   While not addressed by either party, Plaintiff's interrogatory also asserts that quota relief that was not granted to Plaintiff was granted to John Cristison, and that changes to the company code for Raymond James resulted in John Cristison getting paid for 100 plus activations that Plaintiff should have been paid for.

The Court determines that Plaintiff has established a prima facie case based on the comparison of her salary to Frey and Ewing.  Defendant has provided evidence that the experience of each of these individuals qualified them for a higher salary.  Business reasons, such as experience, are legitimate factors other than sex so long as they are capable of being rebutted (but are not ultimately rebutted).  Id. at 956.  A plaintiff can rebut the defense of experience by showing that he or she had equal or more experience of the same type.  Id.

Plaintiff has raised an issue of fact as to whether her years of experience as a BAE and MAM were equal or more than Frey's years of sales experience in other, though related, areas.

Accordingly, summary judgment is **DENIED** as to **Count V** of the Amended Complaint.

### D.    Disability Discrimination Claims (Count VII, XIII)

Plaintiff has asserted claims for disability discrimination under the ADA (Count VII) and the FCRA (Count XIII).[16]   In order to establish a prima facie case of disability discrimination, Plaintiff must show that she "(1) had a disability; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on [her] disability." Collado v. United Parcel Service, Co., 419 F.3d 1143, 1149 (11th Cir. 2005).   The ADA defines "disability" as a "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(2).   According to the Supreme Court,

> to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term. . . .
>
> It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial." *Albertson's,*

---

[16]Claims raised under Florida law are analyzed under the same framework as the ADA. Chanda v. Engelhard/ICC, 234 F.3d 1219, 1221 (11th Cir. 2000).

> *Inc. v. Kirkingburg, supra,* at 567, 119 S.Ct. 2162 (holding that monocular
> vision is not invariably a disability, but must be analyzed on an individual
> basis, taking into account the individual's ability to compensate for the
> impairment).

<u>Toyota Motor Mfg., Kentucky, Inc. v. Williams</u> 534 U.S. 184, 198 (2002).

Plaintiff argues that on or about October 27, 2004, her psychologist recommended she have a leave of absence to give her time to recover from current stress factors and provide medical assistance.  While she was ultimately declined for STD benefits, Defendant granted her a two week leave of absence.  Plaintiff's complaints of migraine headaches and dizzy spells are not sufficient evidence of a severe, permanent, or long term impairment.  Furthermore, Plaintiff testified in her deposition that despite her health issues, she would have continued to work and do her job well like she always had.  As Plaintiff has failed to establish she had an impairment that substantially limited a major life activity, the Court concludes that she has failed to establish a prima facie case for disability discrimination.  Therefore, summary judgment is **GRANTED** in favor of Defendants as to **Counts VII and XIII** of Plaintiff's Amended Complaint.

### E.      Whistleblower Claim (Count XV)

In Count XV of the Amended Complaint, Plaintiff asserts a claim for whistleblower retaliation pursuant to Section 448, Florida Statutes.  Her claim is based upon her purported reporting of "fraud" in connection with the Omega Insurance and other accounts.  The fraudulent activity she claims to have reported regarding the Omega account relates to the

activation of lines by a Verizon Wireless employee without customer approval, followed by the employee's immediate suspension of those lines without billing. Such action allegedly resulted in the employee and her supervisors receiving commissions on the accounts. Plaintiff claims that Young and Orr benefitted from these commissions, and that she was retaliated against for reporting this activity.

Pursuant to Fla. Stat. § 448.102, an employer may not take any retaliatory personnel action against an employee who has

> (1) Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation. However, this subsection does not apply unless the employee has, in writing, brought the activity, policy, or practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice.

> (2) Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer.

> (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

The fraudulent activities for which Plaintiff claims she reported may have resulted in the payment of improper commissions under Defendant's internal procedures. However, Plaintiff did not report or threaten to report these actions to any appropriate governmental agency, person, or entity. Furthermore, Plaintiff has failed to identify any activity, policy, or practice of Verizon Wireless that violated any law, rule, or regulation. Plaintiff's attorney

asserts that any commissions earned by employees engaging in such activity may have resulted in actionable claims for common law fraud or even criminal theft. However, such theft or fraud would have been to the detriment of Verizon Wireless, and can hardly be said to be an activity, policy, or practice of the company.[17]

Accordingly, summary judgment is **GRANTED** in favor of Defendant as to **Count XV** of Plaintiff's Amended Complaint.[18]

### F.    Breach of Employment Contract Claim (Count XVI)

In Count XVI of the Amended Complaint, Plaintiff asserts a claim for breach of her contract of employment under Florida law. Plaintiff claims Defendant breached its employment agreement with her by (i) terminating her stock option rights and stock option plan by falsely asserting she was terminated for cause, (ii) failing to reimburse her for approximately $4,800.00 in business expenses, and (iii) providing false and negative employment references, making it virtually impossible for Plaintiff to obtain comparable employment.

Defendant argues that, by Plaintiff's own admission, she did not have a written employment agreement with Defendant. Furthermore, Defendant's Code of Business

---

[17]Defendant's argument that the reported activity violated Florida's Revised Uniform Partnership Act ("RUPA") is without merit for the same reasons. Furthermore, Plaintiff has failed to establish that the employees engaged in the alleged fraud were partners within the purview of RUPA. See Fla. Stat. § 620.8401.

[18]Plaintiff has also claimed to have reported fraudulent activity on other accounts. However, she has failed to identify an activity, policy, or practice of Verizon Wireless that violated a rule, law, or regulation in connection with any of her fraud claims.

Conduct expressly excludes the existence of any implied contracts based on the company's policies.  As argued by Defendant, the Amended Complaint does not assert the existence of an implied contract.

In response, Plaintiff's argument only addresses the $4,800.00 in business expenses for which she was not reimbursed.  During her deposition, Plaintiff claimed she turned approximately $4,800.00 in business expenses to O'Donoghue that were never reimbursed by Defendant (these expenses included airline travel).  However, other than her deposition testimony, Plaintiff has provided no record evidence to substantiate this amount (i.e., she has produced no receipts or financial record of these expenses).  At this point, this claim rests on a disputed issue of fact and therefore survives summary judgment.  After hearing evidence at trial, the Court will determine whether a reasonable juror could rule in Plaintiff's favor on this claim.

Accordingly, summary judgment is **DENIED** as to **Count XVI** of Plaintiff's Amended Complaint.

### G.     Retaliation Claims (Counts II, IV, VI, VIII, X, XII, XIV)

In the Amended Complaint, Chevola states claims for retaliation under the ADEA, ADA, Title VII, the FCRA, and EPA.  In order to establish a prima facie case for discriminatory retaliation, Plaintiff must show (1) she engaged in a protected activity; (2) she was adversely affected by an employment decision, and (3) there is a causal connection between the two.  Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006).  While the record reflects Plaintiff lodged numerous complaints, there is no evidence that she ever complained

to Defendant that her allegations of discrimination, unfair treatment, and/or favoritism were based on age, sex, disability, or any other unlawful basis. O'Donoghue exhibited this "unfair treatment" as to both men and woman, young and old. Absent some allegation that the mistreatment for which she complained was based on her age, sex, disability, or other unlawful basis, Plaintiff cannot establish she engaged in a statutorily protected activity. See Bicknell v. City of St. Petersburg, 2006 WL 560167, *7 (M.D. Fla. March 7, 2006) (holding complaints or grievances in the absence of some allegation of conduct proscribed by Title VII do not constitute statutorily protected activity); see also Coutu v. Martin County Board of County Commissioners, 47 F.3d 1068, 1074 (11th Cir. 1995) (holding unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII, and that a grievance that is void of such allegations does not constitute statutorily protected activity). Absent a showing that she engaged in a protected activity, Plaintiff cannot establish a prima facie case for discriminatory retaliation.

Accordingly, summary judgment is **GRANTED** in favor of Defendant as to **Counts II, IV, VI, VIII, X, XII, and XIV** of Plaintiff's Amended Complaint.

It is therefore ORDERED AND ADJUDGED that:

1.    Defendant's Motion for Summary Judgment (Dkt. 34) is **GRANTED in part and DENIED in part** as set forth herein.

2.      The Joint Motion to Suspend the Dates of the Final Pretrial Conference and

Trial (Dkt. 60) is **DENIED as moot**.

**DONE** and **ORDERED** in Tampa, Florida on February 1, 2008.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2006\06-cv-1312.msj.frm